UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

TERESA SILVAS,

                    Plaintiff,             Case No.: 11-cv-12510
                                            Honorable Paul D. Borman
           v.                   Magistrate Judge David R. Grand

MICHAEL ASTRUE,
Commissioner of Social Security,

                    Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [12, 16]

Plaintiff Teresa Silvas brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## I.      RECOMMENDATION

For the reasons set forth below, the court finds the ALJ's decision is supported by substantial evidence of record. Accordingly, the court RECOMMENDS that the Commissioner's Motion for Summary Judgment [16] be GRANTED, Silva's motion [12] be DENIED and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be AFFIRMED.

II.     **REPORT**

A.      **Procedural History**

On March 18 and 19, 2007, respectively, Silvas filed applications for DIB and Supplemental Security Income ("SSI"), alleging disability as of September 1, 2006. (Tr. 156-68). The SSI claim was denied on March 26, 2007, due to Silvas's income level, (Tr. 52-59), and she does not challenge that denial. The DIB claim was denied on August 6, 2007. Thereafter, Silvas filed a timely request for an administrative hearing on the denial of her DIB claim, which was held on March 12, 2010, before ALJ Thomas Walters. (Tr. 29-46). Silvas, represented by attorney Mikel Lupisella, testified, as did vocational expert ("VE") Georgette Gunther. (*Id.*). On April 13, 2010, the ALJ found Silvas not disabled. (Tr. 9-23). On April 5, 2011, the Appeals Council denied review. (Tr. 1-3). Silvas filed for judicial review of the final decision on June 9, 2011 [1].

B.      **Background**

1.      *Disability Reports*

In a March 19, 2007, disability field report, the interviewer noted that Silvas had difficulty sitting and standing, remarking that "claimant seemed to be in pain thr[oughout] the interview. [S]he rearranged a few times." (Tr. 182). In an undated disability report, Silvas stated that the conditions limiting her ability to work are a pinched nerve in her shoulder, carpal tunnel, and an unspecified "other illness." (Tr. 185). She reported that these conditions prevent her from working because "[E]very time I try to do a job [I] have spasms and problems with [a] pinched nerve in [my] shoulder. [I] end up going to medical." (*Id.*). Silvas reported that her conditions have existed since an initial injury in 1984, but that she had continued working because her employer "placed me on jobs within my restrictions." (*Id.*). She stopped working

on September 1, 2006, because "there are no jobs I can do with my restrictions." (*Id.*). Silvas reported that the last job she performed for her employer was driving vehicles onto a repair lot, and that there was "no lifting or carrying on this job because my restrictions were 20 lb limit." (Tr. 186). She reported seeing several doctors for her conditions and taking a number of medications, including Advil PM, Alcon cream, and Deseryl for her pain and nerve issues, as well as a number of diabetes medications. (Tr. 187-89).

In a March 28, 2007 function report, Silvas reported that her day consists of washing up or showering, taking medications, eating breakfast, sometimes watching television and eating lunch, laying down, eating supper, watching television, going to the store if needed, washing up, taking medications and going to bed. (Tr. 200). She reported that she is prevented from engaging in several hobbies, including bowling, horseshoes and aerobics, and also from performing any job that she was placed on in the assembly plant. (*Id.*). She reported that she has trouble with certain aspects of personal care, including dressing and reaching certain body parts to clean. (Tr. 201). She is able to cook light and easy meals and does so two to three times a day for five to 25 minutes at a time. (Tr. 202). She also does light housework including sweeping, laundry, loading the dishwasher and cleaning the toilet. (*Id.*). She performs these tasks two to three times a week and they take her less than 20 minutes. (*Id.*). Her husband or son performs the heavier cleaning. (*Id.*). She is able to drive and ride in a car, and shops at stores for necessities and food. (Tr. 203). She spends the majority of her day watching television, although she will go for a drive or ride, call her mother or friends and sit and visit approximately once or twice a week. (Tr. 204). She also goes to the store or to a restaurant once or twice a week. (*Id.*). Silvas reported that her conditions affect her ability to: lift, stand, walk, kneel, stair climb and use her hands. (Tr. 205). She reported that the distance she can walk "varies" and that

she has to rest less than 5 or 10 minutes before resuming.  (*Id.*).

In a March 28, 2007 hand function questionnaire, Silvas reported that she is right hand dominant and that both of her hands are affected by CTS.  (Tr. 208).  She can write legibly, and it takes her about 15-45 minutes to write a one page letter.  (*Id.*).  She experiences numbness in her fingers and hands, stiffness, heaviness and pain.  (*Id.*).  She reported that she "can do most things, but with discomfort/pain," including light housework, picking up small objects and writing."  (*Id.*).  She has trouble reaching parts of her body to clean.  (*Id.*).  She takes Deseryl at night and does not wear braces because they are "to[o] uncomfortable."  (*Id.*).  She experiences increased pain, numbness and tingling at night that radiates to her forearm.  (*Id.*).

In an undated disability appeals report, Silvas reported that her conditions had worsened since her last report and she now suffers from "severe pain in shoulders, hands[,] arms; diabetes not controlled; fibromyalgia; [and] restless leg syndrome."  (Tr. 210).  She reported that the approximate date of these changes was 2006. (*Id.*).  She answered no, however, when asked if she had any new illnesses, injuries or conditions since her last report.  (*Id.*).  She reported that she takes Deseryl for her fibromyalgia, insulin and Zetia for diabetes, Lisonopril for high blood pressure, Prilosec for her stomach, Requip for restless leg syndrome and Synthroid for her thyroid. (Tr. 212).  Silvas reported that any activity increases her pain.  (Tr. 213).

2.    *Plaintiff's Testimony*

Silvas testified at the hearing that she completed high school and some college and that she worked at General Motors ("GM") for 29 years, until September 2006.  (Tr. 34-36).  She receives worker's compensation for bilateral carpal tunnel syndrome.  (*Id.*).  Silvas testified that she attends church and shops for groceries, while and her husband does most of the yard work, although she tries to help him, (including raking and some lawn mowing), because he has a heart

4

condition.  (Tr. 36-37).  Silvas performs the housework, but mostly just does "surface cleaning."  (Tr. 37).  She testified that she gets a "pretty good night's sleep" when she takes her medication, but cannot sleep without it.  (*Id.*).  Her medications do alleviate some of her residual pain, although they make her tired.  (Tr. 37-38).  She takes one or two naps a day, although she cannot always sleep because of her leg and back.  (Tr. 38).

Silvas testified that her hips and legs bother her when she stands, and she must shift often.  (*Id.*).  She can sit in one spot or lie down, and then stand up again if needed.  (*Id.*).  She can walk fifteen to twenty minutes at a time.  (*Id.*).  She sits most of the time.  (*Id.*).  She testified that she can only lift a gallon of milk, has a hard time climbing and descending stairs, (which she must do to do laundry at home), and has difficulty bending, squatting, kneeling, pushing, pulling and reaching.  (Tr. 39).  She also cannot open jars because of her hands, she drops things easily and has a hard time fastening buttons.  (Tr. 39-40).  To alleviate her pain, Silvas testified that she places pillows or a blanket behind her back and neck when she sits, and she elevates her feet at or above waist level.  (Tr. 40).

Silvas testified that her day consisted of cleaning up, watching television and sitting. (Tr. 40-41).  She tries to cook for her husband, goes to church on a church night, goes out to get some fresh air, takes an occasional walk, gets on the computer, and then goes to bed.  (*Id.*).  She is able to drive.  (Tr. 41).  She testified that she is not able to return to her prior work because of her hands and the job's need to reach overhead.  (Tr. 42).

### 3.    *Medical Evidence*

The evidentiary record in this case dates back to 1997, long before Silvas's alleged onset date.  Therefore, medical evidence predating her alleged onset date will be discussed only to the extent it relates to her allegedly disabling conditions.

5

a.    *Treating Sources*

For ease of discussion, Silvas's treating records will be grouped by condition rather than by provider. Further, as Silvas does not argue otherwise, only those conditions addressed by the ALJ will be expounded upon here.[1]

i.    *Fibromyalgia*

Silvas appears to have initially been diagnosed with fibromyalgia by her primary care physician in 1997, although there are no specific examination findings supporting that diagnosis in that doctor's treatment notes. (Tr. 568). However, at an appointment on March 31, 1998, the doctor noted positive trigger points and aches and pain in her neck, shoulders, wrist and back. (Tr. 571). Additional treating records from the period between 1997 and 2001 only occasionally mention her fibromyalgia. (Tr. -569-87). At a May 14, 2003, appointment with her primary care physician, Silvas complained of pain in her shoulder and neck related to a repetitive work injury. (Tr. 346-47). The doctor made a notation on Silvas's record, however, of "? fibromyalgia." (*Id.*). At a December 12, 2003, appointment, the doctor noted that Silvas had been diagnosed with fibromyalgia by a "Dr. Fiechner," (which this court assumes is the rheumatologist discussed in more detail below), but that she had not followed up with him since 1997 and had never tried hydrotherapy. (Tr. 1007). The doctor referred her back to Dr. Fiechtner, a rheumatologist and

---

[1]  For example, in her initial reports Silvas reported right shoulder impingement that contributed to her disabling condition. However, the ALJ did not specifically address evidence of right shoulder impingement in his decision, nor did he find it a severe condition. Not only does Silvas not challenge that determination, she does not mention the issue of right shoulder impingement anywhere in her brief. Thus any argument regarding that condition is waived and, as such, evidence of that condition generally will not be discussed in this Report and Recommendation. *See Martinez v. Comm'r of Soc. Sec.* No. 09-13700, 2011 U.S. Dist. LEXIS 34436 at *7 (E.D. Mich. Mar. 2, 2011) *adopted by* 2011 U.S. Dist. LEXIS 34421 (E.D. Mich. Mar. 30, 2011) (noting that "[a] court is under no obligation to scour the record for errors not identified by a claimant" and "arguments not raised and supported in more than a perfunctory manner may be deemed waived") (citations omitted).

encouraged her to try hydrotherapy.  (Tr. 1008).

Silvas was treated by rheumatologist Dr. Justus Fiechtner on July 1, 2004.  (Tr. 631).
Upon examination he noted no obvious synovitis over Silvas's peripheral joints, some mild
diffuse edema over her hands, and decreased grip strength bilaterally.  (*Id.*).  He noted tenderness
at her wrists, but a full range of motion ("ROM") of her wrists, elbows, shoulders, hips, knees
and ankles.  (*Id.*).  Silvas also had several scattered tender myofascial trigger points.  (*Id.*).  He
diagnosed fibromyalgia, discussed treatment options and prescribed Vioxx for her pain and an
exercise program.  (*Id.*).  At a July 21, 2004 follow-up, Dr. Fiechtner discussed lab results with
Silvas.  She was found to have increased thyroid levels, but admitted to missing several doses of
thyroid medication before her last blood draw.  (Tr. 630).  She also had a borderline rheumatoid
factor of 28 and Dr. Fiechtner discussed inflammatory arthritis.  (*Id.*).  Upon examination, he
noted no significant synovitis over any peripheral joint, although there were several scattered
tender myofascial trigger points.  (*Id.*).  He found good ROM in her wrists, elbows, shoulders,
hips and knees and a slightly decreased ROM in her neck and lumbar spine.  (*Id.*).  He
recommended continuing the Vioxx at bedtime and starting an exercise program.  (*Id.*).

At an October 21, 2004 follow-up appointment, Silvas reported some continued muscle
discomfort but admitted to not exercising and sleeping poorly.  (Tr. 629).  Upon examination, Dr.
Fiechtner noted multiple areas of muscle tenderness and decreased range of motion in the neck
and spine.  (*Id.*).  It was noted that her thyroid level was within normal limits.  (*Id.*).  The doctor
prescribed Zonegran, Celebrex and an exercise regimen.  (*Id.*).  At a March 17, 2005
appointment with her primary care physician, the doctor noted several tender trigger points after
Silvas reported pain in her arms, legs and lower back that had been ongoing for four days.  (Tr.
803).  He prescribed Cymbalta.  (*Id.*).  At an October 6, 2005 follow-up appointment with Dr.

7

2:11-cv-12510-PDB-DRG   Doc # 17   Filed 07/31/12   Pg 8 of 29   Pg ID 1148

Fiechtner, Silvas reported having increasing problems with musculoskeletal pain, primarily with her shoulders, neck and legs and tissue swelling. (Tr. 414). She noted increased pain when she began taking a higher dose of her cholesterol medication. (*Id.*). Examination revealed significant diffuse tissue swelling and multiple areas of muscle tenderness. (*Id.*). She also had a decreased range of motion in her neck and spine. (*Id.*). Dr. Fiechtner noted that while Silvas "does have a previous dose of fibromyalgia" he was "concerned about the possibility of inflammatory arthritis." (*Id.*). He prescribed Plaquenil, Relafin and Topamax and encouraged exercise and weight loss. (*Id.*). A December 2005 blood test revealed a rheumatoid factor of 30. (Tr. 653).

At a January 16, 2006 follow-up appointment with Dr. Fiechtner, Silvas continued to complain of arm pain, but related to a work injury. (Tr. 411). However, she indicated that taking the previously prescribed Topamax was helping. (*Id.*). She also noted good sleep and that she was still not exercising. (*Id.*). Upon examination, Silvas was noted to have good bilateral grip strength and dorsiflexion in her writs. (*Id.*). She admitted to some decreased sensation in her hands, but was able to raise her arms above her head "with ease." (*Id.*). She had some discomfort with palpation of her right shoulder and bilateral paraspinous muscles, and her thoracic and lumbar spine, but no discomfort upon palpation of her feet, ankles, knees or hips. (*Id.*). The doctor diagnosed her with possible psoriatic arthritis and gave her a prescription for Azulfidine. (*Id.*).

At an appointment with her primary care practice on September 19, 2006, Silvas complained of pain in her legs, hips and lower back since May. (Tr. 717). She was prescribed Requip. (Tr. 719). There are no notes regarding a physical examination of Silvas at this appointment. (Tr. 717-21). At an appointment with her primary care practice on November 20,

8

2007, Silvas reported that her Deseryl was no longer working and that she had pain in the night and early morning. (Tr. 422). However, at a December 24, 2007 appointment, Silvas reported decreased fibromyalgia. (Tr. 424).

## ii. *Diabetes*

At an April 1, 2003 appointment with her primary care practice, the nurse noted that Silvas had not been compliant with her diabetes medication and she discussed Silvas's need to be compliant. (Tr. 351-52). At an appointment in October 2003, the nurse again had a "long discussion" regarding Silvas's failure to comply with her diabetes medication. (Tr. 334-35). At an appointment on February 5, 2004, the doctor noted Silvas was not checking her sugars as directed and her diabetes was poorly controlled. (Tr. 856-57). At an appointment on July 26, 2004, Silvas's doctor again noted that her diabetes was poorly controlled. (Tr. 828). A surgery that had been scheduled for June 28, 2004, had to be cancelled due to high blood sugar. (Tr. 832). Blood test results revealed that Silvas had a high glucose and glyco HGB-HGA1C levels ("glyco level") in October 2006 and in January 2007. (Tr. 410; 413). Treatment notes from a January 9, 2007 appointment noted that Silvas had not been on some of her medications due to what appears to be insurance issues. (Tr. 404; 408). Blood tests in April and May of 2007 showed higher than normal glucose and glyco levels. (Tr. 400-401). At a December 24, 2007 appointment, the doctor noted that Silvas's sugars were high after meals, and he discussed with her the need for fasting blood sugar ("FBS") control. (Tr. 424). At an appointment on February 19, 2008, Silvas's glyco level had declined. (Tr. 426). An EMG report from March 5, 2008, noted that Silvas's diabetes was "relatively well controlled."

## iii. *Bilateral Carpal Tunnel Syndrome*

In February 2004, Silvas was diagnosed with left CTS after a positive EMG. (Tr. 228-

9

30).  She underwent left carpal tunnel release with Dr. Erin Hornbach on July 23, 2004, with good results.  (Tr. 216-18; 225-26).  At a March 1, 2007 appointment with her primary care practice, the doctor diagnosed Silvas with left CTS.  (Tr. 398).  However, an EMG of her left hand on June 14, 2007, returned normal results.  (Tr. 391).  Muscle bulk in her hands and arms was normal and reflexes were equal.  (Tr. 392).  There were no Tinel or Horner's sign.  (*Id.*).  Needle testing resulted in normal findings, and all findings were improved over comparable tests performed in 2003, which was prior to surgery.  (Tr. 392-93).

At an appointment with her primary care practice on November 20, 2007, the doctor diagnosed probable CTS based on report of numbness of hands and tingling.  (Tr. 422).  At a December 24, 2007 appointment, the doctor diagnosed right CTS based on reports of numbness. (Tr. 424).  At a February 19, 2008 appointment, the doctor recommended an EMG and nerve conduction study on Silvas's right arm.  (Tr. 427).  A March 5, 2008 EMG study diagnosed right CTS.  (Tr. 439).  The doctor noted, however, that the numbness in Silvas's left hand was alleviated by wearing braces at night and that there was no change in his findings from his previous EMG testing on Silvas's left arm, which were normal.  (Tr. 392-93; 439-40).

On May 8, 2008, Silvas was treated by Dr. Hornbach, who recommended surgery for her right CTS, to which Silvas agreed.  (Tr. 443-44; 466).  Although no surgical notes for this surgery are found in the record, notes from a follow-up on June 2, 2008, appear to show that surgery had been performed.  (Tr. 445) (noting that Silvas's "wound is clean, dry and intact.  NO evidence of infection").  Silvas reported at this appointment that her CTS was significantly improved, and upon examination it was noted she had full digital ROM.  (Tr. 445).  At a follow-up appointment on June 26, 2008, Silvas reported "a lot of hand pain and palm pain."  (Tr. 446). Dr. Hornbach gave her steroid injections.  (*Id.*).  At a follow-up on July 28, 2008, Silvas again

noted pain in her hand and stiffness. (Tr. 453). Upon examination, Dr. Hornbach noted full extension and flexion, no triggering, catching, popping or locking. (*Id.*). She determined that Silvas's condition was related to her diabetes "genetics and everything else that has been going on in her body." (*Id.*). She recommended continued use of the hand and splints and a recheck in six weeks. (*Id.*). There are no further records regarding her CTS.

### iv.    Degenerative Disc Disease Cervical Spine

On October 30, 1998, Silvas underwent a CT scan of her cervical spine. (Tr. 543). The results were normal, although the doctor noted that "bony spurs at C5 may be suggestive of degenerative change." (*Id.*). On May 14, 2003, Silvas reported neck and right shoulder pain to her primary care physician as a result of a repetitive work injury. (Tr. 346-47). Upon examination, the doctor noted decreased neck rotation and flexion and an impingement sign on her right shoulder. (*Id.*). He diagnosed her with cervical strain and right shoulder impingement syndrome and recommended physical therapy. (*Id.*).

At a March 1, 2007, appointment with her primary care practice, the doctor diagnosed Silvas with right shoulder impingement. (Tr. 398). An EMG conducted on June 14, 2007, showed no radiculopathy, and Silvas reported no cervical radicular symptoms, although she reported having neck problems "for years." (Tr. 392). An EMG conducted on March 5, 2008, again noted no radiculopathy or myelopathy, and the doctor recommended that x-rays be taken to determine whether there had been any progression of arthritic abnormalities. (Tr. 439). X-rays taken on October 23, 2008 revealed mild to moderate degenerative disc disease at the C4-5 and C5-6 levels. (Tr. 1046).

### v.    Bilateral Knee Arthritis

At an appointment with Dr. Nishin Tambay on January 13, 1998, Silvas complained of

right knee pain, dating back to 1997 due to increased walking and stair climbing at work.  (Tr. 550).  Upon examination, strength in both legs was 5/5, reflexes were equal bilaterally, and "2+," a straight leg raising test, was negative, as were "Kellogg" and "passive full flexion" tests.  (*Id.*).  Silvas did have some mild tenderness over her right pes anserine bursa and gluteal tender points.  (*Id.*).  The doctor noted her right leg was shorter than her left.  (*Id.*).  He diagnosed pes anserine bursitis, right leg generalized muscle inflexibility and patellofemoral joint syndrome, right knee.  (*Id.*).   X-rays taken on January 19, 2009 of Silvas's bilateral knees revealed mild tricompartmental arthritic changes that were stable since May 27, 2008.  (Tr. 1045).

*vi.    Lumbar Back Pain*

At a June 8, 2008 appointment with her primary care practice, Silvas reported pain in her right leg radiating from her buttocks down.  (Tr. 433).  Upon examination, her reflexes were intact bilaterally and a straight leg raising test was negative.  (*Id.*).  The nurse diagnosed radiculopathy, ordered an MRI and recommended Silvas try Aleve.  (*Id.*).  An MRI conducted on June 15, 2008, revealed "multilevel degenerative changes . . . L3-L4 broad-based diffuse disc protrusion and posterior prominent epidural fat [ ] contributing to moderate spinal canal stenosis," and "prominent epidural fat . . . noted posteriorly at the L4-L5 level, with slightly less prominent posterior epidural fat noted at the L2-L3 level."  (Tr. 464-65).  It also found "L3-L4 disc space narrowing with degenerative changes."  (Tr. 465).  At a follow-up appointment on June 18, 2008, Silvas was referred to a specialist, Dr. Abood.  (Tr. 436).  An EMG and nerve conduction study performed on July 14, 2008, returned normal results.  (Tr. 451-52).  At an August 18, 2008 appointment with Dr. Christopher Abood, Silvas presented after completing a course of physical therapy.  (Tr. 454-56).  She reported that the physical therapy had helped and that she would like to continue with it.  (Tr. 454).  She reported decreased pain and an increased

12

ability to sleep at night.  (*Id.*).  Upon examination, Dr. Abood noted normal tone and muscle strength and full and painless range of motion in all major muscle groups and joints.  (Tr. 456). He agreed to continue Silvas's physical therapy.  (*Id.*).  At an August 21, 2008 appointment with Dr. Michael Wheeler at the Spine Center, Silvas reported intermittent and moderate pain in her back and leg with no numbness/tingling or weakness, which worsened with lying down and walking but improved with rest.  (Tr. 457-59).  Upon examination, Dr. Wheeler noted pain with back flexion and extension and tenderness in the right lumbrosacral region.  (Tr. 459).  He recommended a course of steroid injections  (*Id.*).  The first injection was administered on August 27, 2008.  (Tr. 1039-41).  Silvas's pre-procedure pain level was 4/10 and her post-procedure pain level was 1/10.  (Tr. 1040).  Her second injection was administered on September 10, 2008, at which time her pre-procedure pain level was a 3/10 and her post-procedure pain level was a 1/10.  (Tr. 1036-38).  At a follow-up appointment on September 25, 2008, after two injections, Silvas reported that she had responded well to the injections and thus had cancelled the third one.  (Tr. 460-62).  She reported finding the pain manageable, but that she would still like a TENS unit to address the remaining pain.  (Tr. 460).  Upon examination, Dr. Wheeler noted no abnormal findings and stated he would follow up with her as needed.  (Tr. 462).

### vii.    Work Restrictions

In November 2002, Silvas was treated by her primary care office, which noted that her prior work restrictions had included no pushing or pulling, lifting no more than 20 pounds, and no work above shoulder level.  Silvas reported that these restrictions had been valid for several years but now GM needed them to be renewed.  (Tr. 361).  The nurse and doctor wrote Silvas work restrictions for the next year which were the same as her previous restrictions.  (Tr. 363-64).  At a December 12, 2003 appointment, the doctor noted that Silvas "continues to bemoan

the fact that her job at GM is no longer driving a bus, but now has to work on a line actively.  I get the sense [Silvas] is just not happy with her job and doesn't want to work given the frequent visits for off-work slips for various reasons."  (Tr. 1007).

At an appointment on March 9, 2004, the doctor wrote Silvas another set of restrictions permitting her to return to work but with no use of vibrating tools, limited forceful gripping and grasping, no lifting over 20 pounds and no work at or above shoulder level.  (Tr. 839).  Another return to work note completed the same day permitted Silvas to return to work without restrictions.  (Tr. 841).  At an appointment on August 17, 2005, the doctor noted that Silvas's work restrictions were "good to 2007."  (Tr. 924).  At an appointment on August 29, 2006, Silvas reported that her current work involved mostly driving and walking and that she could perform this work without significant problems with her shoulder.  (Tr. 917).  At an appointment on September 19, 2006, Silvas's doctor noted that she reported being unable to finish her work due to "too many restrictions" and there would be attrition at her employer.  (Tr. 720).

At an appointment on March 1, 2007, the doctor noted that Silvas had not worked in six months because she had "no job to return to (given restrictions)."  (Tr. 398).  He went on to state that her problem was that her "restrictions are not going to go away."  (*Id.*).  With no available job, he concluded that she was "basically disabled from any [and] all work, particularly GM although I would [question] who else could hire her."  (*Id.*).  He then noted that she would bring in a disability form.  (Tr. 399).

On March 13, 2007, Silvas's primary care physician of "20+ years" filled out a disability form for GM.  (Tr. 912-13).  He diagnosed her with right shoulder impingement and CTS supported by limited range of motion and pain, the cause of which was trauma to her shoulder.  (Tr. 912).  He found her prognosis to be poor and that she had not reacted positively to treatment.

14

(*Id.*).  He stated that she had been disabled since March 1, 2007, when he last treated her, and that she would never be capable of resuming substantial gainful employment.  (Tr. 912-13).

   b.      *Consultative and Non-Examining Sources*

Silvas underwent a consultative examination on July 19, 2007 with Dr. Helene Jones. (Tr. 372-80).  She reported that she had been diabetic for ten years, the last three of which she was insulin dependent and that her diabetes was not well-controlled.  (Tr. 372).  She does not see an endocrinologist, however, only her family doctor.  (*Id.*).  She reported no retinopathy, but some numbness and tingling in her hands and feet.  (*Id.*).  She reported left carpal tunnel release in 2004 and similar symptoms in her right hand with no plans for surgery.  (*Id.*).  She denied any active sores or ulcers on her feet and could not report her renal function level.  (*Id.*).  Silvas reported also suffering from restless leg syndrome and fibromyalgia, however, despite notes from a specialist diagnosing possible inflammatory arthritis, Silvas declined to follow the rheumatologist's recommendations and instead followed up with her family doctor.  (*Id.*).  She used Requip and Deseryl, but was not on an anti-inflammatory.  (*Id.*).  She had diffuse musculoskeletal discomfort, but it was diffuse and longstanding.  (*Id.*).  Silvas reported that she lived with her husband in a three-floor walk-up apartment.  (Tr. 373).  She was able to perform activities of daily living, but did not exercise and lived a sedentary lifestyle.  (*Id.*).

Upon examination, Dr. Jones noted that Silvas was overweight, but had a normal range of motion in her neck, back, elbows, wrists, hands, hips, knees, ankles and feet.  (Tr. 373-74).  She had a mild impingement on her right shoulder with about 90% range of motion in that shoulder. (Tr. 374).  A test of a Spurling sign in her neck was negative.  (*Id.*).  Her feet had trace pedal edema but good pulses and no evidence of sores.  (*Id.*).  Dr. Jones noted normal reflexes, and straight leg raising tests of 60 degrees when supine and 90 degrees when seated.  (Tr. 377-78).

15

Based upon the examination, Dr. Jones found that Silvas was capable of all exertional activities. (Tr. 377).

Dr. Russell Holmes completed a residual functional capacity ("RFC") assessment for Silvas on August 6, 2007.  (Tr. 382-89).  He found her capable of lifting twenty pounds occasionally and ten pounds frequently, standing and/or walking six hours in an eight-hour day and sitting for the same amount of time, limited to frequent bilateral hand controls, and capable of occasional climbing, stooping and crouching and frequent balancing, kneeling and crawling. (Tr. 383-84).  She had no communicative limitations, but environmentally she was recommended to avoid concentrated exposure to extreme heat and cold, vibration and hazards.  (Tr. 386).

### 4.   Vocational Expert's Testimony

At the hearing, VE Gunter testified that Silvas's prior jobs at GM were classified as light to medium, and unskilled to semi-skilled.  (Tr. 43-44).  The ALJ asked the VE to assume a hypothetical claimant of Silvas's age, education level, vocational history, who was capable of performing light unskilled work with certain limitations, including no "overhead work," "only occasional bending, twisting, turning, occasional climbing.  No repetitive pushing, pulling, gripping or grasping with the upper extremities[, and n]o use of air or vibrating tools."  (Tr. 44). He then asked if there were unskilled jobs such a claimant could perform.  (*Id.*).  The VE testified that such a claimant could perform the positions of interviewer (2,400 jobs in the regional economy), general office clerk (7,130 jobs), and information clerk (2,485 jobs).  (*Id.*). The ALJ then asked the VE if there were jobs for such a claimant if all of Silvas's testimony was to be found credible.  (*Id.*).  The VE testified that because Silvas testified that she needed to shift a lot, needed to lie down to alleviate pain, and needed to elevate her legs above waist level, those limitations would preclude all competitive employment.   (*Id.*).   The VE testified that her

16

testimony was consistent with the Dictionary of Occupational Titles ("DOT").  (*Id.*).

### C.     Framework for Disability Determinations

Under the Act, DIB is available only for those who have a "disability."  *See Colvin v.*

*Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the

> inability to engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to result in
> death or which has lasted or can be expected to last for a continuous period of not
> less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the

application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity,
> benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of
> impairments that "significantly limits . . . physical or mental ability to do basic
> work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a
> severe impairment that is expected to last for at least twelve months, and the
> severe impairment meets or equals one of the impairments listed in the
> regulations, the claimant is conclusively presumed to be disabled regardless of
> age, education, or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work,
> benefits are denied without further analysis.
>
> Step Five:  Even if claimant is unable to perform his or her past relevant work, if
> other work exists in the national economy that plaintiff can perform, in view of
> his or her age, education, and work experience, benefits are denied.

*Scheunieman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21

(E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of*

*Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout

the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is

not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.     The ALJ's Findings

Following the five-step sequential analysis, the ALJ concluded that Silvas was not disabled.  At Step One he found that she had not engaged in substantial gainful activity since her alleged onset date.  (Tr. 14).  At Step Two he found the following conditions to be severe: "fibromyalgia, diabetes, bilateral carpal tunnel syndrome, degenerative disc disease cervical spine; and bilateral knee arthritis."  (*Id.*).  At Step Three the ALJ determined that none of Silvas's impairments, either alone or in combination, met or medically equaled a listed impairment.  (*Id.*).  The ALJ next assessed Silvas's RFC.  He found her capable of "light work as defined in 20 CFR 404.1567(b) except claimant is limited to work that is unskilled with no reaching overhead, no air or vibratory tools, no repetitive pushing/pulling, or gripping/grasping, and only occasional bending, twisting, turning and climbing."  (Tr. 15).  At Step Four he found that Silvas was not able to return to her prior work.  (Tr. 18).  At Step Five he concluded that, based on Silvas's age, education, vocational background and RFC assessment, coupled with VE testimony, there were a significant number of jobs in the economy that she could still perform.  (Tr. 18-19).  Therefore, he concluded that she was not disabled.  (Tr. 19).

### E.     Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d

591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide

the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.      Analysis

The court first notes that it is difficult to discern exactly what Silvas's arguments are. Her only two stated arguments focus on Silvas's credibility and the adequacy of the ALJ's hypothetical.  The majority of her brief is simply block quotes of cases standing for various black letter propositions (including ones not titled as arguments), with little to no factual analysis supporting their application to her case.[2]   However, for sake of completeness, the court will address those arguments that appear, even in a perfunctory manner, in her brief.[3]

### 1.      The ALJ's Credibility Determination

Silvas first argues that the ALJ erred in finding her reports and testimony less than fully

---

[2] For example, Silvas argues that the ALJ failed to adhere to the treating physician rule, and spends approximately two pages citing cases explaining that rule.  (Plf. Brf. at 12-14).  Her subsequent one-sentence argument reads:  "Throughout the medical records it shows that Ms. Silvas continued to complain of pain in her hands, neck, back and her entire body from fibromyalgia."  (*Id.* at 14).  She fails to cite to any treating physician's opinion, let alone argue that the ALJ failed to give a specific physician's opinion sufficient weight.  Nor does she specify how her complaints of fibromyalgia pain translate to limitations greater than found by the ALJ.

[3] Thus, as noted in Footnote 1 of this Report and Recommendation, because Silvas did not raise any argument regarding the ALJ's Step 2 conclusion that her right shoulder impingement was not a severe impairment, the court need not address that issue.  *Martinez v.* 2011 U.S. Dist. LEXIS 34436 at *7.  The same conclusion applies to the ALJ's Step Two conclusion that her lower back pain was not a severe impairment.  Moreover, because the ALJ found that Silvas had at least one severe impairment, his failure to find that any other particular condition was "severe" cannot constitute reversible error.  *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); *Fisk v. Astrue*, 253 Fed. Appx. 580, 584 (6th Cir. 2007) (noting that once the ALJ determines at least one severe impairment, he "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'") (citing Soc. Sec. Rul. 96-8p, 1996 WL 374184, at *5).  Once the ALJ finds a severe impairment at Step II, he moves on to the remaining sequential steps where he considers the claimant's severe and non-severe impairments.

credible. The Sixth Circuit has held that an ALJ is in the best position to observe a witness's demeanor and to make an appropriate evaluation as to her credibility. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). Thus an ALJ's credibility determination will not be disturbed "absent compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).

When a complaint of pain is in issue, if the ALJ finds a medical condition that could reasonably be expected to produce the claimant's alleged symptoms, he must consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians . . . and any other relevant evidence in the case record" to determine if the claimant's claims regarding the level of her pain are credible. *Soc. Sec. Rul.* 96-7, 1996 SSR LEXIS 4 at *3, 1996 WL 374186 (July 2, 1996); *see also* 20 C.F.R. § 404.1529.

The ALJ did so here. He noted Silvas's reports and testimony regarding her stated pain and the effects of that pain, and he specifically compared those reports and her testimony with the objective medical evidence of record. (Tr. 15-17). He specifically outlined her testified-to limits and restrictions and compared them with the findings of the treating and consulting records. (Tr. 16-17). He concluded that "no doctor who had seen or examined the claimant has expressed an opinion that she is disabled or in any way limited to a greater degree than that found by the undersigned."[4] (Tr. 17).

---

[4] Although Silvas did not argue the issue, and therefore waived it, *supra* fn. 1; *Martinez v.* 2011 U.S. Dist. LEXIS 34436 at *7, the ALJ's statement merits at least some discussion. There can be no dispute that the second part of the statement is true – the ALJ incorporated Silvas's doctor-imposed restrictions into her ultimate RFC. (*Cf.* Tr. 15 with Tr. 839). The accuracy of the statement's first half is murkier. On March 13, 2007, Dr. Smith did fill out a form provided by Silvas's employer, General Motors, in which he apparently opined that she was "disabled." (Tr. 912-13). Yet, that form does not render the ALJ's statement reversible error.

The court notes that the purpose of this form is unclear, though it could be assumed that since it

In support of her argument, Silvas either points to her own reports and testimony, or makes assumptions about her possible reasons for participating in or refusing treatment that are unsupported by any evidence of record.  (Plf. Brf. at 11-12).  Citing one's own testimony in support of why that testimony should be found credible is a circular argument that cannot overcome the ALJ's proper credibility analysis discussed above.  The only evidence she points to is the cervical spine MRI, which she argues "would account for her testimony of severe neck pain."  (*Id.* at 12).  However, she fails to further explain how this MRI result should alter the ALJ's ultimate RFC assessment or his decision that she is not disabled.  Lastly, Silvas takes issue with the ALJ's observation that she "canceled the third [epidural injection] appointment because she responded well to the first two injections."  (Tr. 16).  Silvas essentially argues that she canceled the third treatment not because the first two adequately relieved her pain, but because

---

was provided by (and for) Silvas's employer, it related to her worker's compensation claim, the ultimate determination of which has no bearing on whether or not she is considered disabled under the Act.  (Tr. 17-18; 20 CFR 404.1504).  But even as a social security disability form, it was flawed in numerous respects.  First, to the extent Dr. Smith was rendering an opinion about Silvas's social security disability status, this conclusion does not require ALJ consideration as the determination whether a claimant is or is not disabled under the Act is reserved exclusively to the Commissioner.  20 C.F.R. § 404.1527(e)(1), (e)(3).  Second, Dr. Smith's opinion was rendered days after, and in conjunction with, an appointment with Silvas where he noted that she had not worked at GM in six months not because she was incapable of performing work, but because she had "***no job to return to (given restrictions)…no available job.***"  (Tr. 398-99) (emphasis added).  But basing a finding of "disability" on the fact that GM had no job for Silvas given her restrictions (or based on the doctor's speculation that another employer would hire her, Tr. 398) was improper because a claimant is only disabled if no work exists in ***the national economy*** that she is able to perform given her characteristics and work restrictions.  *See supra* p. 17; 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. 404.1566(a)(3), (c)(1), (c)(3), (c)(7).  To that end, the court notes that the ALJ followed the proper course: Dr. Smith determined Silvas's restrictions; the ALJ gave a hypothetical to the VE that incorporated those restrictions; and the VE testified that given those restrictions, there were in fact jobs that Silvas could perform.  (Tr. 42-45).  Accordingly, the ALJ's decision took into account the information appropriately provided by Dr. Smith.  (Tr. 15; 19; 398-99; 839).  Finally, the court notes that Dr. Smith did not impose any new restrictions on Silvas, and he gave no indication why the prior ones (which were "good to 2007") that enabled her to perform some work would not enable her to perform any work in the future.  (Tr. 398-99; 839; 924).  For all of these reasons, to the extent the ALJ erred in not expressly discussing Dr. Smith's opinion, that error was harmless.

22

"[w]hen she is in pain she is able to lay down and rest to help relieve the pain. She is able to somewhat manage her pain because she is not continuing to aggravate the severe pain [by working]." (Plf. Brf. at 11). Silvas's argument is belied by the record and makes little sense. Silvas reported that she cancelled the third injection because she had "responded well to the first two injections" and thus did not require another. (Tr. 460-62). In fact, she reported her pain level decreased after the first two injections, and that she was doing "much better than before the injections." (Tr. 460, 1037). It makes little sense that Silvas, rather than receiving an additional injection to address any ongoing debilitating pain, would instead address the issue by not working and laying down frequently. The ALJ's credibility assessment should not be disturbed.

2.      The ALJ's Evaluation of Treating Physician Opinions

As noted in Footnote 2 of this Report and Recommendation, Silvas makes a one-sentence argument as to how the ALJ erred in his application of the treating physician's rule – specifically that her subjective complaints to her physicians support a finding of disability. (Plf. Brf. at 14).

The treating physician rule requires that an ALJ give a treating physician's opinion controlling weight where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) *quoting* 20 C.F.R. § 404.1527(d)(2). If an ALJ declines to give a treating physician's opinion controlling weight, she must then determine how much weight to give the opinion, "by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) *citing Wilson*, 378 F.3d at 544; *see also* 20 C.F.R.

23

§ 404.1527(d)(2).  The ALJ must give good reasons, supported by substantial evidence in the record, for the ultimate weight given to a treating source opinion.  *Id.*, *citing Soc. Sec. Rul*. 96-2p, 1996 SSR LEXIS 9 at *12, 1996 WL 374188 at *5.  An ALJ is not required to give any special weight to a treating source's conclusion that a claimant is disabled, as this conclusion is reserved to the Commissioner alone, based on all the evidence of record.  20 C.F. R. § 404.1527(e)(1), (e)(3).  However, where that opinion is based solely on the subjective complaints of the claimant, the ALJ is not entitled to give it controlling weight.  *Williams v. Astrue*, No. 09-cv-042, 2010 U.S. Dist. LEXIS 10781 at *24 (E.D. Tenn. Feb. 8, 2010) (physician's assessment based on claimant's "dubious" self-reporting entitled to minimal weight).

Here, Silvas's only argument is that her subjective reports to her treating physicians support a finding that she is disabled.  (Plf. Brf. at 14).  *See supra*, fn. 2; *supra* p. 22.  She does not identify any particular treating physician or opinions which supposedly were improperly considered by the ALJ.  (*Id.*).  The ALJ specifically noted that no physician, treating or otherwise, opined that Silvas was disabled or more limited than he determined in his RFC analysis (Tr. 17), and, as stated above, *supra*, fn. 4, that finding did not constitute reversible error.  Therefore, Silvas's argument fails.[5]

---

[5] Although not an issue raised by Silvas, the court notes that the ALJ did make a factual error in concluding that no rheumatologist tested Silvas for fibromyalgia.  (Tr. 17).  As discussed in Section II.B.3.a.i. of this Report and Recommendation, Silvas was diagnosed and treated for fibromyalgia by rheumatologist Dr. Fiechtner for several years, all prior to her alleged onset date.  However, the court finds this error harmless, as Dr. Fiechtner never rendered an opinion regarding Silvas's functional abilities, and it was noted in other treatment and consulting records that Silvas failed to continue her treatment with Dr. Fiechtner and failed to comply with his treatment recommendations, instead electing to return to her primary care physician for further treatment.  (Tr. 372).  *See Scott v. Astrue*, No. 08-1194, 2009 U.S. Dist. LEXIS 69767 at *18 n.6 (E.D. Cal. July 30, 2009) (noting in dicta that treatment notes alone are insufficient to support claimant's allegation of pain where treating physician did not offer an opinion); SSR 96-7p, 1996 SSR LEXIS 4 at *21-22 (finding that medical records showing individual's failure to comply with prescribed treatment can be considered in credibility determination where "there are no

3.      The Adequacy of the ALJ's Hypothetical

Silvas argues that the ALJ's "RFC in his decision is not as clearly depicted as the limitations posed in the hypothetical at [the hearing]."  (Plf. Brf. at 8).  However, Silvas never explains in what respect she believes the two sets of restrictions differ.  (*Id.*).  More importantly, the restrictions posed to the VE and those found in the ALJ's decision are substantively identical to one another.  (*Cf.* Tr. 15 with Tr. 44).  Therefore the court concludes that the ALJ's RFC limitations generated proper VE testimony.  *See Burns v.* Astrue, No. 11-309, 2012 U.S. Dist. LEXIS 101585 at *62-63 (D. Neb. July 23, 2012) (where limitations posed in hypothetical are identical to those found in RFC analysis, VE's opinion constitutes substantial evidence supporting ALJ's determination).  Furthermore, as discussed in the two preceding sections, the limitations imposed by the ALJ are supported by substantial evidence in the record, and he was only required to incorporate those limitations he has found to be credible.  *Gant v. Comm'r of Soc. Sec.*, 372 Fed. Appx. 582, 585 (6th Cir. 2010).

4.      The VE's Testimony

Finally, Silvas argues that the VE erred in her testimony by finding that Silvas could perform the jobs of interviewer, general clerk and information clerk when none of those jobs are

---

good reasons for this failure.").

In addition, substantial evidence supports the ALJ's findings regarding Silvas's fibromyalgia since her alleged onset date, which is the date she stopped working.  Since that time, she had only three appointments related to fibromyalgia, all with her primary care physician.  (Tr. 422, 424, 717-21).  As the ALJ noted, none of those appointments appear to include notes of a physical examination, let alone an examination directly related to a fibromyalgia assessment, and the court notes that the last of the notes documented that Silvas's fibromyalgia was "decreasing."  (Tr. 17).  Finally, having been treated for this condition for a number of years, the last set of restrictions imposed by her primary care physician, which were incorporated into those imposed by the ALJ, would have likely taken her fibromyalgia into account.  (Tr. 15; 839).  Therefore, even if this argument were not considered waived by the fact that Silvas did not raise it in any fashion, any error on the part of the ALJ was harmless.

25

classified as unskilled work.  The Commissioner argues that Silvas's argument is based on her apparently picking out specific job titles in the DOT that include those terms and that involve more than unskilled work.  As the Commissioner correctly concludes, the fact that the job title to which the VE testifies does not line up perfectly with the DOT does not render the VE's testimony inconsistent with the DOT as a whole.  *See Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009).

Here, while the DOT does not contain a specific occupational category of "interviewer," there is, however, a title of "interviewing clerks" which consists of numerous positions varying in skill level from 2 (for example, DOT 205.367-014 "Charge Account Clerk") to 7 (205.162-010 "Admitting Officer").  *See generally*, DOT 205 *et. seq.*  Occupations with a skill rating of 1 or 2 are considered unskilled.  *See Frye v. Astrue*, No. 11-1019, 2012 U.S. Dist. LEXIS 69520 at *63 (N.D Ohio Apr. 9, 2012) adopted by 2012 U.S. Dist. LEXIS 69518 (N.D. Ohio May 18, 2012) *citing* SSR 00-4p, 2000 SSR LEXIS 8.  At least five of the positions under that title are rated 2 in skill level.  (DOT 205.367-014 "Charge Account Clerk"; DOT 205.367-026 "Creel Clerk"; DOT 205-367-030 "Election Clerk"; DOT 205.367-054 "Survey Worker"; DOT 205-367-058 "Traffic Checker").  *See Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (noting that the DOT's listed occupation titles 'are collective descriptions of 'occupations' that can encompass numerous jobs.").  With regard to the title of "information clerk," the DOT again contains a category entitled "Receptionists and Information Clerks" that lists several types of information clerks ranging in skill level, two of which fall into the unskilled category.  (*See e.g.* DOT 237.367-018 "Information Clerk"; and 237-367-046 "Telephone Quotation Clerk").

Silvas is correct, however, that the occupation "General Clerk" as specifically set forth in the DOT is a skill level 4 occupation, taking it out of the unskilled category.  (DOT 219.362-010

"Clerk, General Office").  However, that does not mean that unskilled general officer clerk occupations do not exist.  As the Sixth Circuit has stated, "not all occupations are included in the DOT, and the VE may use terminology that differs from the terms used in the DOT . . . the mere fact that the DOT does not list occupations with those precise terms does not establish that they do not exist."  *Beinlich v. Comm'r of Soc. Sec.*, 345 Fed. Appx. 163, 168 (6th Cir. 2009).

Furthermore, even if an inconsistency did exist, "the ALJ is under no independent obligation to verify the accuracy of the VE's testimony beyond what is required under Ruling 00-4p, 2000 SSR LEXIS 8, which the ALJ did here.  Nor is the ALJ bound by the DOT in making his final disability determination."  *Baker v. Comm'r of Soc. Sec.*, 2012 U.S. Dist. LEXIS 84284 at *14 (E.D. Mich.   )  As the Sixth Circuit stated in *Beinlich*:

> Even if there were an inconsistency, the plaintiff has not pointed to any authority that the ALJ erred in his findings based on the VE's testimony, which went unchallenged by the plaintiff until after the ALJ issued his decision.  As an initial matter, neither the ALJ nor the VE is required to follow the DOT.  *Wright v. Massanari*, 321 F.3d 611, 616 (6th Cir. 2003) (holding that "the ALJ and consulting vocational experts are not bound by the Dictionary in making disability determinations because the Social Security regulations do not obligate them to rely on the Dictionary's classifications").  The ALJ fully complied with SSR 00-4p, 2000 SSR LEXIS 8 when he asked the VE whether there was "any discrepancy between [her] opinions and the DOT standards for the requirements of the jobs [she] named."  *See Lindsley*, 560 F.3d at 606 (holding that the ALJ fulfilled his duties when he asked the VE whether there was any "discrepancy between your opinions and the DOT standards," even if the VE did not disclose a conflict).  As *Lindsley* makes clear, the ALJ is under no obligation to investigate the accuracy of the VE's testimony beyond the inquiry mandated by SSR 00-4p, 2000 SSR LEXIS 8.  Id.  This obligation falls to the plaintiff's counsel, who had the opportunity to cross-examine the VE and bring out any conflicts with the DOT.  The fact that plaintiff's counsel did not do so is not grounds for relief. See *Ledford v. Astrue*, 311 Fed. Appx. 746, 757 (6th Cir.2008).

*Beinlich*, 345 Fed. Appx. at 168-69.  Here, too, the ALJ specifically asked the VE at the conclusion of her testimony whether it was consistent with the DOT.  (Tr. 44-45).  She

responded that it was.  (*Id.*).  This was all the ALJ was required to do.  *Beinlich*, 345 Fed. Appx. at 168-69.  Because Silvas's counsel failed to make any further inquiries or challenges to the VE's testimony at the hearing, she has waived any argument she may now have regarding the skill level of the occupations that the VE testified were available to her.  (*Id.*)

For all of the above reasons, the court concludes that the ALJ's decision is supported by substantial evidence in the record.

## III.    CONCLUSION

For the foregoing reasons, the court **RECOMMENDS** that Silvas's Motion for Summary Judgment **[12]** be **DENIED**, the Commissioner's Motion **[16]** be **GRANTED** and this case be **AFFIRMED**.

Dated: July 31, 2012                              s/David R. Grand_____
Ann Arbor, Michigan                         DAVID R. GRAND
                                                             United States Magistrate Judge


### NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

28

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 31, 2012.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager

29